# TOME *v.* UNITED STATES

No. 93–6892.  Argued October 5, 1994—Decided January 10, 1995

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–C, and III, in which STEVENS, SCALIA, SOUTER, and GINSBURG, JJ., joined, and an opinion with respect to Part II–B, in which STEVENS, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 167. BREYER, J., filed a dissenting opinion, in

which REHNQUIST, C. J., and O'CONNOR and THOMAS, JJ., joined, *post*, p. 169.

*Joseph W. Gandert* argued the cause for petitioner. With him on the briefs were *Tova Indritz* and *Carol H. Marion*.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Harris, Paul R. Q. Wolfson*, and *Deborah Watson*.*

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part II–B.

Various Federal Courts of Appeals are divided over the evidence question presented by this case. At issue is the interpretation of a provision in the Federal Rules of Evidence bearing upon the admissibility of statements, made by a declarant who testifies as a witness, that are consistent with the testimony and are offered to rebut a charge of a "recent fabrication or improper influence or motive." Fed. Rule Evid. 801(d)(1)(B). The question is whether out-of-court consistent statements made after the alleged fabrication, or after the alleged improper influence or motive arose, are admissible under the Rule.

I

Petitioner Tome was charged in a one-count indictment with the felony of sexual abuse of a child, his own daughter,

---

*A brief of *amicus curiae* urging affirmance was filed for the State of Ohio et al. by *Lee Fisher*, Attorney General of Ohio, *Richard A. Cordray*, State Solicitor, and *Simon B. Karas*, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Bruce M. Botelho* of Alaska, *Larry EchoHawk* of Idaho, *Pamela Carter* of Indiana, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Jeffery B. Pine* of Rhode Island, *T. Travis Medlock* of South Carolina, *Jan Graham* of Utah, and *Jeffrey L. Amestoy* of Vermont.

*Bruce Robert Rogoff* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae*.

aged four at the time of the alleged crime. The case having arisen on the Navajo Indian Reservation, Tome was tried by a jury in the United States District Court for the District of New Mexico, where he was found guilty of violating 18 U. S. C. §§ 1153, 2241(c), and 2245(2)(A) and (B).

Tome and the child's mother had been divorced in 1988. A tribal court awarded joint custody of the daughter, A. T., to both parents, but Tome had primary physical custody. In 1989 the mother was unsuccessful in petitioning the tribal court for primary custody of A. T., but was awarded custody for the summer of 1990. Neither parent attended a further custody hearing in August 1990. On August 27, 1990, the mother contacted Colorado authorities with allegations that Tome had committed sexual abuse against A. T.

The prosecution's theory was that Tome committed sexual assaults upon the child while she was in his custody and that the crime was disclosed when the child was spending vacation time with her mother. The defense argued that the allegations were concocted so the child would not be returned to her father. At trial A. T., then 6½ years old, was the Government's first witness. For the most part, her direct testimony consisted of one- and two-word answers to a series of leading questions. Cross-examination took place over two trial days. The defense asked A. T. 348 questions. On the first day A. T. answered all the questions posed to her on general, background subjects.

The next day there was no testimony, and the prosecutor met with A. T. When cross-examination of A. T. resumed, she was questioned about those conversations but was reluctant to discuss them. Defense counsel then began questioning her about the allegations of abuse, and it appears she was reluctant at many points to answer. As the trial judge noted, however, some of the defense questions were imprecise or unclear. The judge expressed his concerns with the examination of A. T., observing there were lapses of as much as 40–55 seconds between some questions and the answers

and that on the second day of examination the witness seemed to be losing concentration. The trial judge stated, "We have a very difficult situation here."

After A. T. testified, the Government produced six witnesses who testified about a total of seven statements made by A. T. describing the alleged sexual assaults: A. T.'s babysitter recited A. T.'s statement to her on August 22, 1990, that she did not want to return to her father because he "gets drunk and he thinks I'm his wife"; the babysitter related further details given by A. T. on August 27, 1990, while A. T.'s mother stood outside the room and listened after the mother had been unsuccessful in questioning A. T. herself; the mother recounted what she had heard A. T. tell the babysitter; a social worker recounted details A. T. told her on August 29, 1990, about the assaults; and three pediatricians, Drs. Kuper, Reich, and Spiegel, related A. T.'s statements to them describing how and where she had been touched by Tome. All but A. T.'s statement to Dr. Spiegel implicated Tome. (The physicians also testified that their clinical examinations of the child indicated that she had been subjected to vaginal penetrations. That part of the testimony is not at issue here.)

A. T.'s out-of-court statements, recounted by the six witnesses, were offered by the Government under Rule 801(d)(1)(B). The trial court admitted all of the statements over defense counsel's objection, accepting the Government's argument that they rebutted the implicit charge that A. T.'s testimony was motivated by a desire to live with her mother. The court also admitted A. T.'s August 22d statement to her babysitter under Rule 803(24), and the statements to Dr. Kuper (and apparently also to Dr. Reich) under Rule 803(4) (statements for purposes of medical diagnosis). The Government offered the testimony of the social worker under both Rules 801(d)(1)(B) and 803(24), but the record does not indicate whether the court ruled on the latter ground. No

objection was made to Dr. Spiegel's testimony. Following trial, Tome was convicted and sentenced to 12 years' imprisonment.

On appeal, the Court of Appeals for the Tenth Circuit affirmed, adopting the Government's argument that all of A. T.'s out-of-court statements were admissible under Rule 801(d)(1)(B) even though they had been made after A. T.'s alleged motive to fabricate arose. The court reasoned that "the pre-motive requirement is a function of the relevancy rules, not the hearsay rules" and that as a "function of relevance, the pre-motive rule is clearly too broad . . . because it is simply not true that an individual with a motive to lie always will do so." 3 F. 3d 342, 350 (1993). "Rather, the relevance of the prior consistent statement is more accurately determined by evaluating the strength of the motive to lie, the circumstances in which the statement is made, and the declarant's demonstrated propensity to lie." *Ibid.* The court recognized that some Circuits require that the consistent statements, to be admissible under the Rule, must be made before the motive or influence arose, see, *e. g., United States* v. *Guevara,* 598 F. 2d 1094, 1100 (CA7 1979); *United States* v. *Quinto,* 582 F. 2d 224, 234 (CA2 1978), but cited the Ninth Circuit's decision in *United States* v. *Miller,* 874 F. 2d 1255, 1272 (1989), in support of its balancing approach. Applying this balancing test to A. T.'s first statement to her babysitter, the Court of Appeals determined that although A. T. might have had "some motive to lie, we do not believe that it is a particularly strong one." 3 F. 3d, at 351. The court held that the District Judge had not abused his discretion in admitting A. T.'s out-of-court statements. It did not analyze the probative quality of A. T.'s six other out-of-court statements, nor did it reach the admissibility of the statements under any other rule of evidence.

We granted certiorari, 510 U. S. 1109 (1994), and now reverse.

## II

The prevailing common-law rule for more than a century before adoption of the Federal Rules of Evidence was that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it was inadmissible if made afterwards. As Justice Story explained: "[W]here the testimony is assailed as a fabrication of a recent date, . . . in order to repel such imputation, proof of the *antecedent* declaration of the party may be admitted." *Ellicott* v. *Pearl*, 10 Pet. 412, 439 (1836) (emphasis added). See also *People* v. *Singer*, 300 N. Y. 120, 124–125, 89 N. E. 2d 710, 712 (1949).

McCormick and Wigmore stated the rule in a more categorical manner: "[T]he applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated." E. Cleary, McCormick on Evidence § 49, p. 105 (2d ed. 1972) (hereafter McCormick). See also 4 J. Wigmore, Evidence § 1128, p. 268 (J. Chadbourn rev. 1972) (hereafter Wigmore) ("A consistent statement, at a *time prior* to the existence of a fact said to indicate bias . . . will effectively explain away the force of the impeaching evidence" (emphasis in original)). The question is whether Rule 801(d)(1)(B) embodies this temporal requirement. We hold that it does.

## A

Rule 801 provides:

> "(d) Statements which are not hearsay.—A statement is not hearsay if—
>
> "(1) Prior statement by witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . .

"(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."

Rule 801 defines prior consistent statements as nonhearsay only if they are offered to rebut a charge of "recent fabrication or improper influence or motive." Fed. Rule Evid. 801(d)(1)(B). Noting the "troublesome" logic of treating a witness' prior consistent statements as hearsay at all (because the declarant is present in court and subject to cross-examination), the Advisory Committee decided to treat those consistent statements, once the preconditions of the Rule were satisfied, as nonhearsay and admissible as substantive evidence, not just to rebut an attack on the witness' credibility. See Advisory Committee's Notes on Fed. Rule Evid. 801(d)(1), 28 U. S. C. App., p. 773. A consistent statement meeting the requirements of the Rule is thus placed in the same category as a declarant's inconsistent statement made under oath in another proceeding, or prior identification testimony, or admissions by a party opponent. See Fed. Rule Evid. 801.

The Rules do not accord this weighty, nonhearsay status to all prior consistent statements. To the contrary, admissibility under the Rules is confined to those statements offered to rebut a charge of "recent fabrication or improper influence or motive," the same phrase used by the Advisory Committee in its description of the "traditiona[l]" common law of evidence, which was the background against which the Rules were drafted. See Advisory Committee's Notes, *supra*, at 773. Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited. In the present context, the question is whether A. T.'s out-of-court statements rebutted the alleged link between her desire to be with her mother and her testimony, not whether they suggested that A. T.'s in-court testimony was true. The Rule

speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told.

This limitation is instructive, not only to establish the pre-conditions of admissibility but also to reinforce the significance of the requirement that the consistent statements must have been made before the alleged influence, or motive to fabricate, arose. That is to say, the forms of impeachment within the Rule's coverage are the ones in which the temporal requirement makes the most sense. Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is, as a general matter, capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive. By contrast, prior consistent statements carry little rebuttal force when most other types of impeachment are involved. McCormick §49, p. 105 ("When the attack takes the form of impeachment of character, by showing misconduct, convictions or bad reputation, it is generally agreed that there is no color for sustaining by consistent statements. The defense does not meet the assault" (footnote omitted)); see also 4 Wigmore §1131, p. 293 ("The broad rule obtains in a few courts that consistent statements may be admitted *after* impeachment of any sort—in particular after any impeachment by *cross-examination*. But there is no reason for such a loose rule" (footnote omitted)).

There may arise instances when out-of-court statements that postdate the alleged fabrication have some probative force in rebutting a charge of fabrication or improper influence or motive, but those statements refute the charged fabrication in a less direct and forceful way. Evidence that a witness made consistent statements after the alleged motive to fabricate arose may suggest in some degree that the in-court testimony is truthful, and thus suggest in some degree

that that testimony did not result from some improper influence; but if the drafters of Rule 801(d)(1)(B) intended to countenance rebuttal along that indirect inferential chain, the purpose of confining the types of impeachment that open the door to rebuttal by introducing consistent statements becomes unclear. If consistent statements are admissible without reference to the timeframe we find imbedded in the Rule, there appears no sound reason not to admit consistent statements to rebut other forms of impeachment as well. Whatever objections can be leveled against limiting the Rule to this designated form of impeachment and confining the rebuttal to those statements made before the fabrication or improper influence or motive arose, it is clear to us that the drafters of Rule 801(d)(1)(B) were relying upon the common-law temporal requirement.

The underlying theory of the Government's position is that an out-of-court consistent statement, whenever it was made, tends to bolster the testimony of a witness and so tends also to rebut an express or implied charge that the testimony has been the product of an improper influence. Congress could have adopted that rule with ease, providing, for instance, that "a witness' prior consistent statements are admissible whenever relevant to assess the witness' truthfulness or accuracy." The theory would be that, in a broad sense, any prior statement by a witness concerning the disputed issues at trial would have some relevance in assessing the accuracy or truthfulness of the witness' in-court testimony on the same subject. The narrow Rule enacted by Congress, however, cannot be understood to incorporate the Government's theory.

Our analysis is strengthened by the observation that the somewhat peculiar language of the Rule bears close similarity to the language used in many of the common-law cases that describe the premotive requirement. "Rule 801(d)(1) (B) employs the precise language—'rebut[ting] . . . charge[s] . . . of recent fabrication or improper influence or motive'—

consistently used in the panoply of pre-1975 decisions." Ohlbaum, The Hobgoblin of the Federal Rules of Evidence: An Analysis of Rule 801(d)(1)(B), Prior Consistent Statements and a New Proposal, 1987 B. Y. U. L. Rev. 231, 245. See, *e. g., Ellicott* v. *Pearl,* 10 Pet., at 439; *Hanger* v. *United States,* 398 F. 2d 91, 104 (CA8 1968); *People* v. *Singer,* 300 N. Y. 120, 89 N. E. 2d 710 (1949).

The language of the Rule, in its concentration on rebutting charges of recent fabrication or improper influence or motive to the exclusion of other forms of impeachment, as well as in its use of wording that follows the language of the common-law cases, suggests that it was intended to carry over the common-law premotive rule.

## B

Our conclusion that Rule 801(d)(1)(B) embodies the common-law premotive requirement is confirmed by an examination of the Advisory Committee's Notes to the Federal Rules of Evidence. We have relied on those well-considered Notes as a useful guide in ascertaining the meaning of the Rules. See, *e. g., Huddleston* v. *United States,* 485 U. S. 681, 688 (1988); *United States* v. *Owens,* 484 U. S. 554, 562 (1988). Where, as with Rule 801(d)(1)(B), "Congress did not amend the Advisory Committee's draft in any way . . . the Committee's commentary is particularly relevant in determining the meaning of the document Congress enacted," *Beech Aircraft Corp.* v. *Rainey,* 488 U. S. 153, 165–166, n. 9 (1988). The Notes are also a respected source of scholarly commentary. Professor Cleary was a distinguished commentator on the law of evidence, and he and members of the Committee consulted and considered the views, criticisms, and suggestions of the academic community in preparing the Notes.

The Notes disclose a purpose to adhere to the common law in the application of evidentiary principles, absent express provisions to the contrary. Where the Rules did depart from their common-law antecedents, in general the Commit-

tee said so. See, *e. g.*, Notes on Rule 804(b)(4), 28 U. S. C. App., p. 790 ("The general common law requirement that a declaration in this area must have been made *ante litem motam* has been dropped, as bearing more appropriately on weight than admissibility"); Rule 804(b)(2), *id.*, at 789 ("The exception is the familiar dying declaration of the common law, expanded somewhat beyond its traditionally narrow limits"); Rule 804(b)(3), *ibid.* ("The exception discards the common law limitation and expands to the full logical limit"). The Notes give no indication, however, that Rule 801(d)(1)(B) abandoned the premotive requirement. The entire discussion of Rule 801(d)(1)(B) is limited to the following comment:

> "Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive but not as substantive evidence. Under the rule they are substantive evidence. The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally." Notes on Rule 801(d)(1)(B), *id.*, at 773.

Throughout their discussion of the Rules, the Advisory Committee's Notes rely on Wigmore and McCormick as authority for the common-law approach. In light of the categorical manner in which those authors state the premotive requirement, see *supra*, at 156, it is difficult to imagine that the drafters, who noted the new substantive use of prior consistent statements, would have remained silent if they intended to modify the premotive requirement. As we observed with respect to another provision of the Rules, "[w]ith this state of unanimity confronting the drafters of the Federal Rules of Evidence, we think it unlikely that they intended to scuttle entirely [the common-law requirement]." *United States* v. *Abel*, 469 U. S. 45, 50 (1984). Here, we do not think the drafters of the Rule intended to scuttle the

162

whole premotive requirement and rationale without so much as a whisper of explanation.

Observing that Edward Cleary was the Reporter of the Advisory Committee that drafted the Rules, the Court has relied upon his writings as persuasive authority on the meaning of the Rules. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U. S. 579 (1993); *Abel, supra,* at 51–52. Cleary also was responsible for the 1972 revision of McCormick's treatise, which included an examination of the changes introduced by the proposed federal rules to the common-law practice of impeachment and rehabilitation. The discussion, which occurs only three paragraphs after the treatise's categorical description of the common-law premotive rule, also lacks any indication that the proposed rules were abandoning that temporal limitation. See McCormick § 50, p. 107.

Our conclusion is bolstered by the Advisory Committee's stated "unwillingness to countenance the general use of prior prepared statements as substantive evidence." See Notes on Rule 801(d)(1), 28 U. S. C. App., p. 773. Rule 801(d), which "enumerates three situations in which the statement is excepted from the category of hearsay," *ibid.,* was expressly contrasted by the Committee with Uniform Rule of Evidence 63(1) (1953), "which allows *any* out-of-court statement of a declarant who is present at the trial and available for cross-examination." Notes on Rule 801(d)(1), *supra,* at 773 (emphasis added). When a witness presents important testimony damaging to a party, the party will often counter with at least an implicit charge that the witness has been under some influence or motive to fabricate. If Rule 801 were read so that the charge opened the floodgates to any prior consistent statement that satisfied Rule 403, as the Tenth Circuit concluded, the distinction between rejected Uniform Rule 63(1) and Rule 801(d)(1)(B) would all but disappear.

That Rule 801(d)(1)(B) permits prior consistent statements to be used for substantive purposes after the statements are admitted to rebut the existence of an improper influence or

motive makes it all the more important to observe the preconditions for admitting the evidence in the first place. The position taken by the Rules reflects a compromise between the views expressed by the "bulk of the case law . . . against allowing prior statements of witnesses to be used generally as substantive evidence" and the views of the majority of "writers . . . [who] ha[d] taken the opposite position." *Ibid.* That compromise was one that the Committee candidly admitted was a "judgment . . . more of experience than of logic." *Ibid.*

"A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 521 (1989) (applying that presumption in interpreting Federal Rule of Evidence 609). Nothing in the Advisory Committee's Notes suggests that it intended to alter the common-law premotive requirement.

## C

The Government's final argument in favor of affirmance is that the common-law premotive rule advocated by petitioner is inconsistent with the Federal Rules' liberal approach to relevancy and with strong academic criticism, beginning in the 1940's, directed at the exclusion of out-of-court statements made by a declarant who is present in court and subject to cross-examination. This argument misconceives the design of the Rules' hearsay provisions.

Hearsay evidence is often relevant. "The only way in which the probative force of hearsay differs from the probative force of other testimony is in the absence of oath, demeanor, and cross-examination as aids in determining credibility." Advisory Committee's Introduction to Article VIII, 28 U. S. C. App., p. 771. That does not resolve the matter, however. Relevance is not the sole criterion of admissibility. Otherwise, it would be difficult to account for the Rules' general proscription of hearsay testimony (absent a specific

exception), see Fed. Rule Evid. 802, let alone the traditional analysis of hearsay that the Rules, for the most part, reflect. *Ibid.* ("The approach to hearsay in these rules is that of the common law. . . . The traditional hearsay exceptions are drawn upon for the exceptions . . ."). That certain out-of-court statements may be relevant does not dispose of the question whether they are admissible.

The Government's reliance on academic commentators critical of excluding out-of-court statements by a witness, see Brief for United States 40, is subject to like criticism. To be sure, certain commentators in the years preceding the adoption of the Rules had been critical of the common-law approach to hearsay, particularly its categorical exclusion of out-of-court statements offered for substantive purposes. See, *e. g.,* Weinstein, The Probative Force of Hearsay, 46 Iowa L. Rev. 331, 344–345 (1961) (gathering sources). General criticism was directed to the exclusion of a declarant's out-of-court statements where the declarant testified at trial. See, *e. g., id.,* at 333 ("[T]reating the out of court statement of the witness himself as hearsay" is a "practical absurdity in many instances"); Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L. Rev. 177, 192–196 (1948). As an alternative, they suggested moving away from the categorical exclusion of hearsay and toward a case-by-case balancing of the probative value of particular statements against their likely prejudicial effect. See Weinstein, *supra,* at 338; Ladd, The Relationship of the Principles of Exclusionary Rules of Evidence to the Problem of Proof, 18 Minn. L. Rev. 506 (1934). The Advisory Committee, however, was explicit in rejecting this balancing approach to hearsay:

> "The Advisory Committee has rejected this approach to hearsay as involving too great a measure of judicial discretion, minimizing the predictability of rulings, [and] enhancing the difficulties of preparation for trial." Advisory Committee's Introduction, *supra,* at 771.

Given the Advisory Committee's rejection of both the general balancing approach to hearsay and of Uniform Rule 63(1), see *supra*, at 162, the Government's reliance on the views of those who advocated these positions is misplaced.

The statement-by-statement balancing approach advocated by the Government and adopted by the Tenth Circuit creates the precise dangers the Advisory Committee noted and sought to avoid: It involves considerable judicial discretion; it reduces predictability; and it enhances the difficulties of trial preparation because parties will have difficulty knowing in advance whether or not particular out-of-court statements will be admitted. See Advisory Committee's Introduction, *supra*, at 771.

D

The case before us illustrates some of the important considerations supporting the Rule as we interpret it, especially in criminal cases. If the Rule were to permit the introduction of prior statements as substantive evidence to rebut every implicit charge that a witness' in-court testimony results from recent fabrication or improper influence or motive, the whole emphasis of the trial could shift to the out-of-court statements, not the in-court ones. The present case illustrates the point. In response to a rather weak charge that A. T.'s testimony was a fabrication created so the child could remain with her mother, the Government was permitted to present a parade of sympathetic and credible witnesses who did no more than recount A. T.'s detailed out-of-court statements to them. Although those statements might have been probative on the question whether the alleged conduct had occurred, they shed but minimal light on whether A. T. had the charged motive to fabricate. At closing argument before the jury, the Government placed great reliance on the prior statements for substantive purposes but did not once seek to use them to rebut the impact of the alleged motive.

We are aware that in some cases it may be difficult to ascertain when a particular fabrication, influence, or motive

arose. Yet, as the Government concedes, a majority of common-law courts were performing this task for well over a century, see Brief for United States 39, and the Government has presented us with no evidence that those courts, or the judicial circuits that adhere to the rule today, have been unable to make the determination. Even under the Government's hypothesis, moreover, the thing to be rebutted must be identified, so the date of its origin cannot be that much more difficult to ascertain. By contrast, as the Advisory Committee commented, see *supra*, at 164, the Government's approach, which would require the trial court to weigh all of the circumstances surrounding a statement that suggest its probativeness against the court's assessment of the strength of the alleged motive, would entail more of a burden, with no guidance to attorneys in preparing a case or to appellate courts in reviewing a judgment.

## III

Courts must be sensitive to the difficulties attendant upon the prosecution of alleged child abusers. In almost all cases a youth is the prosecution's only eyewitness. But "[t]his Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases." *United States* v. *Salerno*, 505 U. S. 317, 322 (1992). When a party seeks to introduce out-of-court statements that contain strong circumstantial indicia of reliability, that are highly probative on the material questions at trial, and that are better than other evidence otherwise available, there is no need to distort the requirements of Rule 801(d)(1)(B). If its requirements are met, Rule 803(24) exists for that eventuality. We intimate no view, however, concerning the admissibility of any of A. T.'s out-of-court statements under that section, or any other evidentiary principle. These matters, and others, are for the Court of Appeals to decide in the first instance.

Our holding is confined to the requirements for admission under Rule 801(d)(1)(B). The Rule permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive. These conditions of admissibility were not established here.

The judgment of the Court of Appeals for the Tenth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the judgment of the Court, and join its opinion except for Part II–B. That Part, which is devoted entirely to a discussion of the Advisory Committee's Notes pertinent to Rule 801(d)(1)(B), gives effect to those Notes not only because they are "a respected source of scholarly commentary," *ante*, at 160, but also because they display the "purpose," *ibid.*, or "inten[t]," *ante*, at 161, of the draftsmen.

I have previously acquiesced in, see, *e. g., Beech Aircraft Corp.* v. *Rainey*, 488 U. S. 153 (1988), and indeed myself engaged in, see *United States* v. *Owens*, 484 U. S. 554, 562 (1988), similar use of the Advisory Committee Notes. More mature consideration has persuaded me that is wrong. Having been prepared by a body of experts, the Notes are assuredly persuasive scholarly commentaries—ordinarily *the* most persuasive—concerning the meaning of the Rules. But they bear no special authoritativeness as the work of the draftsmen, any more than the views of Alexander Hamilton (a draftsman) bear more authority than the views of Thomas Jefferson (not a draftsman) with regard to the meaning of the Constitution. It is the words of the Rules that have been authoritatively adopted—by this Court, or by Congress if it makes a statutory change. See 28 U. S. C.

§§ 2072, 2074 (1988 ed. and Supp. IV). In my view even the adopting Justices' thoughts, unpromulgated as Rules, have no authoritative (as opposed to persuasive) effect, any more than their thoughts regarding an opinion (reflected in exchanges of memoranda before the opinion issues) authoritatively demonstrate the meaning of that opinion. And the same for the thoughts of congressional draftsmen who prepare statutory amendments to the Rules. Like a judicial opinion and like a statute, the promulgated Rule says what it says, regardless of the intent of its drafters. The Notes are, to be sure, submitted to us and to the Members of Congress as the thoughts of the body initiating the recommendations, see § 2073(d); but there is no certainty that either we or they read those thoughts, nor is there any procedure by which we formally endorse or disclaim them. That being so, the Notes cannot, by some power inherent in the draftsmen, change the meaning that the Rules would otherwise bear.

In the present case, the merely persuasive force of the Advisory Committee Notes suffices. Indeed, in my view the case can be adequately resolved without resort to the Advisory Committee at all. It is well established that "'"the body of common law knowledge"'" must be "'"a source of guidance"'" in our interpretation of the Rules. *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 588 (1993) (quoting *United States* v. *Abel*, 469 U. S. 45, 52 (1984) (quoting Cleary, Preliminary Notes on Reading the Rules of Evidence, 57 Neb. L. Rev. 908, 915 (1978))). Rule 801(d)(1)(B) uses language that tracks common-law cases and prescribes a result that makes no sense except on the assumption that that language indeed adopts the common-law rule. As the Court's opinion points out, only the premotive-statement limitation makes it rational to admit a prior corroborating statement to rebut a charge of recent fabrication or improper motive, but not to rebut a charge that the witness' memory is playing tricks.

JUSTICE BREYER, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE THOMAS join, dissenting.

The basic issue in this case concerns not hearsay, but relevance. As the majority points out, the common law permitted a lawyer to rehabilitate a witness (after a charge of improper motive) by pointing to the fact that the witness had said the same thing earlier—but only if the witness made the earlier statement *before* the motive to lie arose. The reason for the time limitation was that, otherwise, the prior consistent statement had no *relevance* to rebut the charge that the in-court testimony was the product of the motive to lie. The treatises, discussing the matter under the general heading of "impeachment and support" (McCormick) or "relevancy" (Wigmore), and not "hearsay," make this clear, stating, for example, that a

> "'prior consistent statement has no relevancy to refute [a] charge [of recent fabrication, etc.,] unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated.'" *Ante*, at 156 (quoting E. Cleary, McCormick on Evidence § 49, p. 105 (2d ed. 1972) (hereinafter McCormick)).

The majority believes that a hearsay-related rule, Federal Rule of Evidence 801(d)(1)(B), codifies this absolute timing requirement. I do not. Rule 801(d)(1)(B) has nothing to do with relevance. Rather, that Rule carves out a subset of prior consistent statements that were formerly admissible only to rehabilitate a witness (a nonhearsay use that relies upon the fact that the statement was made). It then says that members of that subset are "not hearsay." This means that, *if* such a statement is admissible for a particular rehabilitative purpose (to rebut a charge of recent fabrication or improper influence or motive), its proponent now may use it substantively, for a hearsay purpose (*i. e.*, as evidence of its truth), as well.

The majority is correct in saying that there are different kinds of categories of prior consistent statements that can rehabilitate a witness in different ways, including statements (a) placing a claimed inconsistent statement in context; (b) showing that an inconsistent statement was not made; (c) indicating that the witness' memory is not as faulty as a cross-examiner has claimed; and (d) showing that the witness did not recently fabricate his testimony as a result of an improper influence or motive. See *United States* v. *Rubin*, 609 F. 2d 51, 68 (CA2 1979) (Friendly, J., concurring). But, I do not see where, in the existence of several categories, the majority can find the premise, which it seems to think is important, that the reason the drafters singled out one category (category (d)) was that category's special probative force in respect to rehabilitating a witness. Nor, in any event, do I understand how that premise can help the majority reach its conclusion about the common-law timing rule.

I doubt the premise because, as McCormick points out, other categories of prior consistent statements (used for rehabilitation) also, on occasion, seem likely to have strong probative force. What, for example, about such statements introduced to rebut a charge of faulty memory (category (c) above)? McCormick says about such statements: "If the witness's accuracy of memory is challenged, it seems *clear common sense* that a consistent statement made shortly after the event and before he had time to forget, should be received in support." McCormick § 49, at 105, n. 88 (emphasis added). Would not such statements (received in evidence to rehabilitate) often turn out to be highly probative as well?

More important, the majority's conclusion about timing seems not to follow from its "especially probative force" premise. That is because probative force has little to do with the concerns underlying hearsay law. Hearsay law basically turns on an out-of-court declarant's reliability, as tested through cross-examination; it does not normally turn

on the probative force (if true) of that declarant's statement. The "timing" circumstance (the fact that a prior consistent statement was made after a motive to lie arose) may diminish probative force, but it does not diminish reliability. Thus, from a hearsay perspective, the timing of a prior consistent statement is basically beside the point.

At the same time, one can find a *hearsay*-related reason why the drafters might have decided to restrict the Rule to a particular category of prior consistent statements. Juries have trouble distinguishing between the rehabilitative and substantive use of the kind of prior consistent statements listed in Rule 801(d)(1)(B). Judges may give instructions limiting the use of such prior consistent statements to a rehabilitative purpose, but, in practice, juries nonetheless tend to consider them for their substantive value. See 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(1)(B)[01], p. 801–188 (1994) ("[A]s a practical matter, the jury in all probability would misunderstand or ignore a limiting instruction [with respect to the class of prior consistent statements covered by the Rule] anyway, so there is no good reason for giving one"). It is possible that the Advisory Committee made them "nonhearsay" for that reason, *i. e.*, as a concession "more of experience than of logic." Advisory Committee's Notes on Fed. Rule Evid. 801(d)(1)(B), 28 U. S. C. App., p. 773 (also noting that the witness is available for cross-examination in the courtroom in any event). If there was a reason why the drafters excluded from Rule 801(d)(1)(B)'s scope other kinds of prior consistent statements (used for rehabilitation), perhaps it was that the drafters concluded that those other statements caused jury confusion to a lesser degree. On this rationale, however, there is no basis for distinguishing between *pre*motive and *post*motive statements, for the confusion with respect to each would very likely be the same.

In sum, because the Rule addresses a hearsay problem and one can find a reason, unrelated to the premotive rule, for

why it does so, I would read the Rule's plain words to mean exactly what they say: If a trial court properly admits a statement that is "consistent with the declarant's testimony" for the purpose of "rebut[ting] an express or implied charge . . . of recent fabrication or improper influence or motive," then that statement is "not hearsay," and the jury may also consider it for the truth of what it says.

Assuming Rule 801(d)(1)(B) does not codify the absolute timing requirement, I must still answer the question whether, as a *relevance* matter, the common-law statement of the premotive rule stands as an absolute bar to a trial court's admission of a postmotive prior consistent statement for the purpose of rebutting a charge of recent fabrication or improper influence or motive. The majority points to statements of the timing rule that do suggest that, for reasons of relevance, the law of evidence *never* permits their admission. *Ante*, at 156. Yet, absolute-sounding rules often allow exceptions. And, there are sound reasons here for permitting an exception to the timing rule where circumstances warrant.

For one thing, one can find examples where the timing rule's claim of "no relevancy" is simply untrue. A postmotive statement *is* relevant to rebut, for example, a charge of recent fabrication based on improper motive, say, when the speaker made the prior statement while affected by a far more powerful motive to tell the truth. A speaker might be moved to lie to help an acquaintance. But, suppose the circumstances *also* make clear to the speaker that only the truth will save his child's life. Or, suppose the postmotive statement was made spontaneously, or when the speaker's motive to lie was much weaker than it was at trial. In these and similar situations, special circumstances may indicate that the prior statement was made for some reason other than the alleged improper motivation; it may have been made not *because of,* but *despite,* the improper motivation. Hence, postmotive statements can, *in appropriate circumstances,* directly refute the charge of fabrication based on

improper motive, not because they bolster in a general way the witness' trial testimony, see *ante*, at 159, but because the circumstances indicate that the statements are not causally connected to the alleged motive to lie.

For another thing, the common-law premotive rule was not as uniform as the majority suggests. Cf. *United States* v. *Abel*, 469 U. S. 45, 50 (1984) (stating that where the common law was *unanimous*, the drafters of the Federal Rules likely intended to preserve it). A minority of courts recognized that postmotive statements could be relevant to rebut a charge of recent fabrication or improper influence or motive under the right circumstances. See, *e. g.*, *United States* v. *Gandy*, 469 F. 2d 1134, 1135 (CA5 1972); *Copes* v. *United States*, 345 F. 2d 723, 726 (CADC 1964); *State* v. *George*, 30 N. C. 324, 328 (1848). I concede that the majority of courts took the rule of thumb as absolute. But, I have searched the cases (and the commentators) in vain for an explanation of why that should be so. See, *e. g.*, McCormick § 49, at 105, and n. 88 (citing cases).

One can imagine a possible explanation: Trial judges may find it easier to administer an absolute rule. Yet, there is no indication in any of the cases that trial judges would, or do, find it particularly difficult to administer a more flexible rule in this context. And, there is something to be said for the greater authority that flexibility grants the trial judge to tie rulings on the admissibility of rehabilitative evidence more closely to the needs and circumstances of the particular case. 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 401[01], pp. 401–8 to 401–9 (1994) ("A flexible approach . . . is more apt to yield a sensible result than the application of a mechanical rule"). Furthermore, the majority concedes that the premotive rule, while seemingly bright line, poses its own administrative difficulties. *Ante*, at 165–166.

This Court has acknowledged that the Federal Rules of Evidence worked a change in common-law relevancy rules in the direction of flexibility. See *Daubert* v. *Merrell Dow*

*Pharmaceuticals, Inc.,* 509 U. S. 579 (1993). Article IV of the Federal Rules, which concerns relevance, liberalizes the rules for admission of relevant evidence. See *id.,* at 587. The Rules direct the trial judge generally to admit all evidence having "any tendency" to make the existence of a material fact "more probable or less probable than it would be without the evidence." Fed. Rules Evid. 401, 402. The judge may reject the evidence (assuming compliance with other rules) only if the probative value of the evidence is substantially outweighed by its tendency to prejudice a party or delay a trial. Rule 403. The codification, as a general matter, relies upon the trial judge's administration of Rules 401, 402, and 403 to keep the barely relevant, the time wasting, and the prejudicial from the jury. See, *e. g., Abel, supra,* at 54 ("A district court is accorded a wide discretion in . . . [a]ssessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility"); 1 Weinstein's Evidence, *supra,* ¶ 401[01] (discussing broad discretion accorded trial judge); 22 C. Wright & K. Graham, Federal Practice and Procedure § 5162 (1978 and 1994 Supp.).

In *Daubert,* this Court considered the rule of *Frye* v. *United States,* 293 F. 1013 (CADC 1923), which had excluded scientific evidence that had not gained general acceptance in the relevant field. 509 U. S., at 585–586. Like the premotive rule here at issue, the *Frye* rule was "rigid," setting forth an "absolute prerequisite to admissibility," which the Court said was "at odds with the 'liberal thrust' of the Federal Rules." *Id.,* at 588. *Daubert* suggests that the liberalized relevancy provisions of the Federal Rules can supersede a pre-existing rule of relevance, at least where no compelling practical or logical support can be found for the pre-existing rule. It is difficult to find any strong practical or logical considerations for making the premotive rule an absolute condition of admissibility here. Perhaps there are other circumstances in which categorical common-law rules serve the purposes of Rules 401, 402, and 403, and should, accordingly,

remain absolute in the law. But, for the reasons stated above, this case, like *Daubert,* does not present such a circumstance. Thus, considered purely as a matter of relevancy law (and as though Rule 801(d)(1)(B) had not been written), I would conclude that the premotive rule did not survive the adoption of the Rules.

Irrespective of these arguments, one might claim that, nonetheless, the drafters, in writing Rule 801(d)(1)(B), relied on the continued existence of the common-law relevancy rule, and that Rule 801(d)(1)(B) therefore reflects a belief that the common-law relevancy rule would survive. But, I would reject that argument. For one thing, if the drafters had wanted to insulate the common-law rule from the Rules' liberalizing effect, this would have been a remarkably indirect (and therefore odd) way of doing so—both because Rule 801(d)(1)(B) is utterly silent about the premotive rule and because Rule 801(d)(1)(B) is a rule of hearsay, not relevancy. For another thing, there is an equally plausible reason why the drafters might have wanted to write Rule 801(d)(1)(B) the way they did—namely, to allow substantive use of a particular category of prior consistent statements that, when admitted as rehabilitative evidence, was especially impervious to a limiting instruction. See *supra,* at 171.

Accordingly, I would hold that the Federal Rules authorize a district court to allow (where probative in respect to rehabilitation) the use of postmotive prior consistent statements to rebut a charge of recent fabrication or improper influence or motive (subject of course to, for example, Rule 403). Where such statements are admissible for this rehabilitative purpose, Rule 801(d)(1)(B), as stated above, makes them admissible as substantive evidence as well (provided, of course, that the Rule's other requirements, such as the witness' availability for cross-examination, are satisfied). In most cases, this approach will not yield a different result from a strict adherence to the premotive rule for, in most cases, postmotive statements will not be significantly probative.

And, even in cases where the statement is admitted as significantly probative (in respect to rehabilitation), the effect of admission on the trial will be minimal because the prior consistent statements will (by their nature) do no more than repeat in-court testimony.

In this case, the Court of Appeals, applying an approach consistent with what I have described above, decided that A. T.'s prior consistent statements were probative on the question of whether her story as a witness reflected a motive to lie. There is no reason to reevaluate this factbound conclusion. Accordingly, I would affirm the judgment of the Court of Appeals.